U.S. Court of Appeals No. 20-15114
U.S.D.C. Case No. 19-cv-03435-BLF

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

ROBERT W. AHLSTROM,

*Plaintiff-Appellant,*

vs.

DHI MORTGAGE COMPANY, LTD., L.P.,

*Defendant-Appellee.*

---

# DEFENDANT-APPELLEE'S RESPONSE BRIEF

---

On Appeal from The United States District Court
For The Northern District of California
Case No. 19-CV-03435-BLF
The Honorable Beth Labson Freeman, Judge Presiding

---

JACK S. SHOLKOFF, State Bar No. 145097
jack.sholkoff@ogletree.com
JENNIFER L. KATZ, CA Bar No. 258917
jennifer.katz@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, CA 90071
Telephone: 213.239.9800
Facsimile: 213.239.9045

Attorneys for Defendant-Appellee
DHI MORTGAGE COMPANY, LTD., L.P.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, defendant-appellee DHI Mortgage Company, Ltd., L.P. (“DHIM”), certifies the following:

DHIM has one general partner, DHI Mortgage Company GP, Inc., and one limited partner, DHI Mortgage Company LP, Inc. Both DHI Mortgage Company GP, Inc. and DHI Mortgage Company LP, Inc. are 100 percent owned by DHI Mortgage Company, which is a wholly owned subsidiary of D.R. Horton, Inc., which is a publicly traded entity. Other than these entities, there are no other parents or publicly held corporations that own ten percent or more of DHIM’s stock.

# TABLE OF CONTENTS

**Page**


CORPORATE DISCLOSURE STATEMENT ........................................................i

I. INTRODUCTION ........................................................................................1

II. FACTUAL ALLEGATIONS RELEVANT TO THE INSTANT APPEAL ..3

A. Ahlstrom's Employment And Agreement to Arbitrate. ........................3

B. Ahlstrom's First Lawsuit And Order Compelling Arbitration. ............8

C. Ahlstrom's Second Lawsuit And Order Compelling Arbitration. ......10

III. SUMMARY OF ARGUMENT ..................................................................12

IV. LEGAL ARGUMENT ..................................................................................15

A. Because The MAA Contains A Clear And Unmistakable Delegation Clause Regarding Non-Class Action Waiver Issues, This Court Must Compel The Matter To Individual Arbitration. .......15

B. Contract Formation May Properly Be Delegated To An Arbitrator. ..........................................................................................25

C. Even If Contract Formation May Not Be Delegated, The District Court Did Find A Contract Was Formed. ..............................28

D. All Of The Elements Of A Contract Are Present, And Ahlstrom Has Failed To Provide Evidence To The Contrary. ............................28

E. The MAA's Opt-Out Provision Does Not Vitiate Ahlstrom's Prior Acceptance Of The Agreement. .................................................31

1. The Language Of The MAA And The Opt-Out Provision Within It Are Clear In Their Meaning And Purpose. ...............31

2. Applicable Principles Of Contract Interpretation Do Not Favor The Absurd Outcome Proposed By Ahlstrom. ...............32

3. Judge Freeman Has Twice Correctly Ruled Against Ahlstrom's Proposed Reading, And The Case Law On

Which He Relies To Show The Existence Of A Condition Precedent Is Inapposite. ....36

4. The Rule Of Interpretation Against The Drafter Is Inapplicable. ....47

V. CONCLUSION ....51

STATEMENT OF RELATED CASES ....53

CERTIFICATE OF COMPLIANCE ....54

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**


*Ahlstrom v. DHI Mortg. Co. GP, Inc.*,
No. 17-CV-04383-BLF, 2018 WL 6268876 (N.D. Cal. Nov. 30, 2018) ....17, 36, 43, 45, 50

*AT&T Techs., Inc. v. Commc'ns Workers*
475 U.S. 643 (1986)....15

*In re: Auto. Parts Antitrust Litig.*
951 F.3d 377 (6th Cir. 2020) ....25

*Bayer v. Comcast Cable Communications, LLC*
No. 12-C-8618, 2013 WL 1849519 (N.D. Ill. May 1, 2013) ....20, 21

*Bazuaye v. I.N.S.*
79 F.3d 118 (9th Cir. 1996) ....12

*Berk v. Coinbase, Inc.*
No. 18-CV-01364-VC, 2018 WL 5292244 (N.D. Cal. Oct. 23, 2018) ....21

*Brennan v. Opus Bank*
796 F.3d 1125 (9th Cir. 2015) ....15, 16

*California v. Hodari D.*
499 U.S. 621 (1991)....46

*Clayborne v. Lithia Motors, Inc.*
No. 1:17-cv-0588-AWI-BAM, 2017 WL 6017009 (E.D. Cal. Dec. 5, 2017) ....16

*DeVries v. Experian Info. Sols., Inc.*
No. 16-CV-02953-WHO, 2017 WL 733096 (N.D. Cal. Feb. 24, 2017) ....19

*Edwards v. Doordash, Inc.*
888 F.3d 738 (5th Cir. 2018) ....25

*Epic Systems Corp. v. Lewis*
138 S.Ct. 1612 (2018)....................................................................................9

*Fedor v. United Healthcare, Inc.*
976 F.3d 1100 (2020)...........................................................................25, 26

*Gountoumas v. Giaran, Inc.*
No. CV-18-7720-JFW(PJWX), 2018 WL 6930761 (C.D. Cal. Nov. 21, 2018) ..........................................................................................19

*Granite Rock Co. v. International Brotherhood of Teamsters*
561 U.S. 287 (2010)..................................................................................26

*Henry Schein, Inc. v. Archer & White Sales, Inc.*
139 S. Ct. 524 (2019)................................................................................27

*International Brotherhood of Teamsters v. NASA Services, Inc.*
957 F.3d 1038 (9th Cir. 2020) ........................... 14, 29, 36, 37, 38, 39, 40, 41, 51

*Kilgore v. Keybank Nat'l Ass'n*
673 F.3d 947 (9th Cir. 2012) .....................................................................15

*Knutson v. Sirius XM Radio Inc.*
771 F.3d 559 (9th Cir. 2014) .....................................................................30

*Kubala v. Supreme Prod. Servs., Inc.*
830 F.3d 199 (5th Cir. 2016) .....................................................................25

*Kum Tat Ltd. v. Linden Ox Pasture, LLC*
845 F.3d 979 (9th Cir. 2017) ...............................................................26, 29

*Lamps Plus, Inc. v. Varela*
139 S. Ct. 1407 (2019)....................................................................47, 48, 51

*MegaCorp Logistics LLC v. Turvo, Inc.*
No. 18-CV-01240-EMC, 2018 WL 3619656 (N.D. Cal. July 30, 2018) ..........................................................................................20

*Miller v. Fairchild Indus., Inc.*
797 F.2d 727 (9th Cir. 1986) .....................................................................12

*Miller v. Time Warner Cable Inc.*
No. 816CV00329CASASX, 2016 WL 7471302 (C.D. Cal. Dec. 27, 2016) ........ 19

*Mohamed v. Uber Technologies, Inc.*
848 F. 3d 1201 (9th Cir. 2016) ........ 17, 18

*Netbula, LLC v. BindView Dev. Corp.*
516 F. Supp. 2d 1137 (N.D. Cal. 2007) ........ 30

*Powertech Tech. Inc. v. Tessera, Inc*.
No. 4:10-CV-00945-CW, 2014 WL 2538973 (N.D. Cal. June 5, 2014) ........ 33

*Rent-A-Ctr., W., Inc. v. Jackson*
561 U.S. 63 (2010) ........ 15, 16, 25

*Revitch v. DIRECTV, LLC*
No. 18-16823, 2020 WL 5814095 (9th Cir. Sept. 30, 2020) ........ 48

*Roth v. Garcia Marquez*
942 F.2d 617 (9th Cir. 1991) ........ 42

**California Cases**

*Armendariz v. Found. Health Psychcare Servs., Inc.*
24 Cal. 4th 83 (2000) ........ 31

*Artukovich v. Pacific States Cast Iron Pipe Co*.
78 Cal. App. 2d 1 (1947) ........ 43, 44

*B. L. Metcalf Gen. Contractor, Inc. v. Earl Erne Inc*.
212 Cal. App. 2d 689 (1963) ........ 50

*Broome v. Broome*
104 Cal. App. 2d 148 (1951) ........ 33

*Cortez v. Doty Brothers Equipment Co.*
15 Cal. App. 5th 1 (2017) ........ 35

*In re Crossman's Estate*
231 Cal. App. 2d 370 (1964) ........ 42, 43, 44, 45

*Dennison v. Rosland Capital, LLC*
47 Cal. App. 5th 204 (2020) ........................................................22, 23

*Devencenzi v. Donkonics*
170 Cal. App. 2d 513 (1959) ........................................................44, 45

*Dexter v. Ankiewicz*
26 Cal. App. 2d 326 (1938) ........................................................45, 46

*Donovan v. RRL Corp.*
26 Cal. 4th 261 (2001) ........................................................29, 30

*Garner v. Inter-State Oil Co.*
52 Cal. App. 5th 619, 625 (2020) ........................................................31

*Hillsborough LLC v. Marcus & Millichap Real Estate Investment Brokerage Co.*
No. E038589, 2006 WL 2501580 (Cal. Ct. App. Aug. 30, 2006)................41, 42

*Estate of Klauenberg*
32 Cal. App. 3d 1067 (1973) ........................................................47

*Malone v. Superior Court*
226 Cal. App. 4th 1551 (2014) ........................................................16

*Pac. Corporate Group Holdings, LLC v. Keck*
232 Cal. App. 4th 294 (2014) ........................................................32, 45

*Peleg v. Neiman Marcus Group, Inc.*
204 Cal. App. 4th 1425 (2012) ........................................................22, 23

*Retsloff v. Smith*
79 Cal. App. 443 (1926) ........................................................33

*Sy First Family Ltd. Partnership v. Cheung*
70 Cal. App. 4th 1334 (1999) ........................................................34

**Federal Statutes**

9 U.S.C. § 2 ........................................................27, 31

**California Statutes**

California Civil Code § 1550 ........................................................29

California Civil Code § 1565 ........................................................................29
California Civil Code § 1584 ........................................................................47
California Civil Code § 1636 ........................................................................33
California Civil Code § 1638 ........................................................................35
California Civil Code § 1641 ........................................................................33
California Civil Code § 1643 ..................................................................33, 50
California Civil Code § 1653 ........................................................................34
California Civil Code § 1654 ..................................................................47, 50
California Civil Code § 3541 ........................................................................33

## I. INTRODUCTION

Plaintiff-Appellant Robert Ahlstrom ("Ahlstrom") agreed to arbitrate his wage and hour claims against his employer, defendant-appellee DHI Mortgage Company, Ltd., L.P. ("DHIM"), on an individualized basis. Ahlstrom signed the Mutual Arbitration Agreement ("MAA" or "Agreement") and did not exercise his right pursuant to the MAA to subsequently opt out. Nonetheless, Ahlstrom contends, relying upon pedantry and sophistry, and a misinterpretation of the terms of the MAA, instead of reason and law, that he should not be compelled to arbitrate his dispute as he has been ordered to do.

There are at least three reasons why Ahlstrom's argument fails.

First, as discussed in DHIM's Motion to Compel Arbitration, Judge Beth Labson Freeman of the Northern District of California has already *twice* correctly ruled that the issue before the Court must be decided by the arbitrator. Judge Freeman found, as should this Court, that the MAA clearly and unmistakably delegates to the arbitrator all pertinent gateway issues (other than those related to the MAA's class waiver), such that the only thing left for the Court to do (as she correctly did) was to compel the matter to individual arbitration and dismiss the putative class claims. As Ahlstrom has failed to establish that the delegation in the MAA was anything other than clear and unmistakable, despite his attempts to muddy the waters by creating an artificial conflict where none exists, this Court

must follow Judge Freeman and order the matter to arbitration on an individual basis.

Second, because Ahlstrom's entire argument for avoiding the MAA rests upon his *misinterpretation* of the provisions of the MAA, and because the Parties expressly agreed that any questions concerning the MAA's interpretation must be *decided by the arbitrator*, the Court must send this case to arbitration.

And, third, even if the Court were to consider the merits of Ahlstrom's attack, it should still send the case to arbitration. Ahlstrom argues that he is not subject to the MAA even though he (a) signed the MAA, and (b) did not opt out. Ahlstrom contends that, despite his concession that he did, in fact, accept the MAA when he signed it, the only way for the contract to be valid would be if he (a) did not opt-out from it, *and* (b) accepted employment with D.R. Horton, Inc. ("D.R. Horton"), an entity related to DHIM. Ahlstrom, however, ignores that the MAA's opt-out provision was not the method by which Ahlstrom accepted the terms of the MAA. Indeed, Ahlstrom does not mention that *by signing the MAA* he agreed to arbitrate his claims, and by failing to opt out, he *reiterated* his *prior* acceptance. Judge Freeman correctly found that Ahlstrom did exactly that.

Notably, Ahlstrom has at no time contended that he did not sign the MAA or make any efforts to opt-out; nor has he argued that he himself believed that by signing the MAA in connection with his employment with DHIM, he was agreeing

only to arbitrate claims against D.R. Horton—an entity by which he was never employed. In fact, Ahlstrom has at no point in any of the lawsuits he has filed in an effort to evade his arbitration obligation put forth a single iota of evidence whatsoever.

It really comes down to this: Ahlstrom cannot use *his failure* to exercise his opt-out right as a way to escape his acceptance of the MAA. If Ahlstrom wanted to opt out, he should have returned the proffered Opt-Out Form instead of remaining silent. He stayed silent. Thus, he is bound by the MAA.

Accordingly, the Court should affirm Judge Freeman's Order granting DHIM's Motion to Compel Arbitration in its entirety.

## II. FACTUAL ALLEGATIONS RELEVANT TO THE INSTANT APPEAL

### A. <u>Ahlstrom's Employment And Agreement to Arbitrate.</u>

On July 24, 2015, Ahlstrom, at the beginning of his employment with DHIM, entered into a binding arbitration agreement titularly with D.R. Horton, but also covering all claims he might have against DHIM. (Excerpts of Record ["ER"] 110-111, ¶¶2,8; ER 117-119.) Specifically, in agreeing to the terms of the MAA, Ahlstrom agreed that:

> [A]ll legal disputes and claims between them, including without limitation those relating to Employee's employment with the Company [D.R. Horton] or any separation ***therefrom and claims by Employee against the Company's parents, subsidiaries, affiliates,***

> ***directors, employees, or agents***, shall be determined exclusively by final and binding arbitration before a single, neutral arbitrator as described herein.

(ER 117, ¶1) (emphasis added).[1]) Both DHIM and DHI Mortgage Company GP, Inc. ("DHIM GP") are subsidiaries and/or affiliated entities of D.R. Horton. (ER 108, ¶3.) Thus, Ahlstrom agreed to arbitrate all of his "legal disputes and claims" against DHIM. (ER 117-119.)

The MAA clarifies that the types of claims subject to arbitration thereunder include, among others, claims for "wages," "overtime," and "breach of any express or implied contract," and explains that "by agreeing to submit the described claims to binding arbitration, Employee...does knowingly and voluntarily waive the right to file, or participate or obtain relief in, a court action of any nature seeking recovery of money damages or injunctive relief against the Company," except as otherwise expressly provided elsewhere in the document.[2] (ER 117, ¶¶1,3.)

The document further specifies certain categories of claims and actions that are expressly excluded from coverage under the MAA, including, but not limited to: "claims for which this Agreement would be invalid as a matter of law"; "actions to enforce this Agreement, compel arbitration, or enforce or vacate an

---

[1] All emphasis herein is original unless otherwise noted.

[2] In its final paragraph, immediately before the signature block, the Agreement also states, "By signing this Agreement, Employee acknowledges that he or she is knowingly and voluntarily waiving the right to file a lawsuit relating to Employee's employment with the Company as well as the right to resolve disputes in a proceeding before a judge or jury, except as described above." (ER 119, ¶12.)

arbitrator's award under this Agreement"; and "an action by either party seeking a provisional remedy in any court of competent jurisdiction[.]"[3] (ER 117, ¶2.) The Agreement further explains that, with respect to actions to enforce the MAA, compel arbitration, or enforce or vacate an arbitration award, "the parties hereby agree and stipulate that such actions and this Agreement are covered and governed by Section 2 of the Federal Arbitration Act and not any state law," and that "[j]udgment upon the arbitrator's award may be entered in any court of competent jurisdiction." (*Id.*) The MAA provides that any arbitration will be administered by the parties' chosen arbitrator in accordance with the employment rules of the American Arbitration Association ("AAA")[4] and Rule 68 of the Federal Rules of Civil Procedure. (ER 117-118, ¶5.)

The MAA also includes a class action waiver, stating that it:

> **prohibits the arbitrator from consolidating the claims of others into one proceeding, to the maximum extent permitted by law. This means an arbitrator shall hear only individual claims and is prohibited from fashioning a proceeding as a class, collective, representative, or group action or awarding relief to a group of employees in one proceeding, to the maximum extent permitted by law. Any question or dispute concerning the scope or validity of this**

[3] None of the other exclusions apply to Ahlstrom's claims against DHIM in this case. (ER 117, ¶¶2,3.)

[4] The MAA provided a link to where the AAA Rules could be found online, and stated that they could also be "requested from the Company." (ER 118, ¶5.)

> **paragraph shall be decided by a court of competent jurisdiction and not the arbitrator.**

(ER 118, ¶7.) Aside from the statement in the class waiver reserving jurisdiction in the courts for disputes about the validity and/or scope of said waiver, the MAA otherwise explicitly states that the *arbitrator*, not a court of law, shall determine issues as to validity of the arbitration agreement:

> [T]he arbitrator, and not any federal, state, or local court, shall have exclusive authority to resolve any dispute relating to the formation, enforceability, applicability, or interpretation of this Agreement, including without limitation any claim that this Agreement is void or voidable. Thus, except as noted in the following paragraph [related to the class action waiver], the parties voluntarily waive the right to have a court determine the enforceability of this Agreement.

(*Id.*, ¶6.)

The MAA also includes a provision addressing modification and severability, as well as a jury trial waiver for claims not subject to the MAA:

> If any provision of this Agreement is deemed invalid or unenforceable, such provision shall be modified automatically to the minimum extent necessary to render the Agreement valid and enforceable. If a provision conflicts with a mandatory provision of applicable law, the conflicting provision shall be severed automatically and the remainder of the Agreement construed to incorporate the mandatory provision. In the event of such automatic severance and modification with respect to a particular provision, the remainder of this Agreement shall not be affected. Similarly, should a court determine that arbitration pursuant to this Agreement is unavailable for any reason, the parties agree and stipulate that they

> hereby waive any right to a jury and instead agree and stipulate that the claim(s) at issue will be heard only by a judge.

(ER 118-119, ¶9.) The MAA also provides that it "shall be construed as a whole, according to its fair meaning, and not for or against any party." (ER 119, ¶10.)

The MAA was not presented to Ahlstrom as mandatory or a condition of employment with DHIM. Ahlstrom could have refused to sign it and still worked at DHIM. Indeed, the MAA provides that Ahlstrom could have, even after executing it, opted-out by "delivering, within 30 days of the date this Agreement is provided to Employee, a completed and signed Opt-Out Form to the Company's senior Human Resources officer at the Company's headquarters. An Opt-Out Form is available from Human Resources upon request" (the "Opt-Out Provision"). (*Id.*, ¶11.) The Opt-Out Provision further states that, "[i]f Employee does not deliver the executed form within 30 days, and if Employee accepts or continues employment with the Company after that date, he or she shall be deemed to have accepted the terms of this Agreement." (*Id.*)

Both Ahlstrom and DHIM executed the MAA, using electronic signatures, on July 24, 2015. (ER 110-111, ¶¶3-8; ER 119.) The MAA was executed on behalf of DHIM by Crystal Stone, who, at the time, was DHIM's Division Human Resources Coordinator. (ER 111, ¶8; ER 119.) Ahlstrom did not opt-out of the MAA, and worked for DHIM as a Loan Originator Assistant and Mortgage Loan

Originator from approximately July 20, 2015 through December 9, 2016. (ER 110, ¶2; ER 111-112, ¶9.)

## B. Ahlstrom's First Lawsuit And Order Compelling Arbitration.

Following his termination from DHIM (*see* ER 110, ¶2), Ahlstrom filed suit in the Northern District of California against two entities related to DHIM—D.R. Horton and DHIM GP—in the matter entitled *Ahlstrom v. DHI Mortgage Company GP, Inc., et al.*, Case No. 5:17-cv-04383-BLF[5] (the "Prior Federal Action"). (ER 67, ¶2; ER 108, ¶3; Ahlstrom's Motion for Judicial Notice ["MJN"], Ex. 1.) In the Prior Federal Action, Ahlstrom alleged against DHIM GP and D.R. Horton the identical employment claims that he currently asserts against DHIM—all based on the allegation that Ahlstrom was jointly employed by both named entities.[6] (*Compare* Supplemental Excerpts ["SER"] 334-361, *with* MJN, Ex. 1.)

In September of 2018, the defendants in the Prior Federal Action filed a motion to compel arbitration, which Ahlstrom opposed solely based on the same technicality in the language of the Opt-Out Provision that is at issue on this appeal;

---

[5] Shortly thereafter, Ahlstrom also filed a Complaint in state court pursuant to the Labor Code Private Attorneys General Act of 2004, Cal. Lab. Code §§ 2698, *et seq.* ("PAGA"). (ER 67, ¶3.)

[6] Although D.R. Horton and DHIM GP made clear to Ahlstrom that neither entity employed Ahlstrom, and DHIM was the correct defendant, Ahlstrom did not amend the complaint or otherwise add DHIM as a defendant in the Prior Federal Action. (ER 67, ¶2.)

Ahlstrom did not contend that the MAA was unconscionable or otherwise unenforceable based on its terms.[7] (ER 68, ¶¶6-7; MJN, Exs. 2-3, 5-6.) On November 30, 2018, the Honorable Beth Labson Freeman granted the defendants' motion, sending Ahlstrom's individual claims to arbitration, dismissing his putative class and collective claims, and dismissing the case without prejudice. (ER 68-69, ¶8; MJN, Ex. 7.) Among other things, Judge Freeman held that "interpretation of [the opt-out] provision is delegated exclusively to the arbitrator and cannot be adjudicated by this Court." (MJN, Ex. 7, at 4:21-5:14 ("By its very name and nature, the 'opt-out' provision provided an opportunity for Ahlstrom to opt out of his previously rendered acceptance. And to determine whether Ahlstrom successfully opted out, the Court would have to interpret the agreement and decide whether failure to accept employment with D.R. Horton satisfies the condition for opting out. That is precisely the type of formation / interpretation question Ahlstrom clearly and unmistakably agreed to delegate to the arbitrator.").)

Notwithstanding Judge Freeman's Order, Ahlstrom has declined to seek individual arbitration of his claims against DHIM GP and/or D.R. Horton. (ER 69, ¶9.)

[7] D.R. Horton and DHIM GP had also filed an earlier motion to compel arbitration, which Ahlstrom opposed, then contending only that the MAA's class waiver was unenforceable; thereafter, the parties stipulated to a stay pending the Supreme Court's then-pending ruling in *Epic Systems Corp. v. Lewis*, 138 S.Ct. 1612 (2018). (ER 67-68, ¶¶4-5; MJN, Ex. 2.)

### C. Ahlstrom's Second Lawsuit And Order Compelling Arbitration.

Despite his promises under the MAA to arbitrate his disputes with DHIM and the Order by Judge Freeman in the Prior Federal Action, on March 27, 2019, Ahlstrom filed his Complaint in the underlying action alleging nine causes of action against DHIM—all arising from his employment, and identical to those brought in the Prior Federal Action. (SER 217-244; MJN, Ex. 1.) Other than Ahlstrom's seventh claim, which is brought pursuant to the federal Fair Labor Standards Act ("FLSA"), each of Ahlstrom's claims is brought pursuant to California law.[8] Each claim derives from allegations that DHIM purportedly committed violations of the California Labor Code and Wage Orders, the California Business & Professions Code, the FLSA, and the common law regarding contracts. (SER 217-244.) In addition to bringing his claims individually, Ahlstrom seeks to represent a proposed class (along with multiple sub-classes), defined as "All persons employed by Defendants and/or any staffing agencies and/or any other third parties who worked in hourly or non-exempt positions in California during the Relevant Time Period." (SER 220-221, ¶¶10,11.) All of Ahlstrom's claims against DHIM relate to his employment and,

---

[8] The causes of action are: failure to provide meal periods, failure to provide rest periods, failure to pay hourly wages, failure to provide accurate written wage statements, failure to timely pay all final wages, unfair competition, failure to pay employees for all hours worked pursuant to the FLSA, breach of written contract, and breach of the implied covenant of good faith and fair dealing. (SER 217-244.)

therefore, fall within the definition of arbitrable claims pursuant to the MAA. (ER 117, ¶¶1-2.)

On July 22, 2019, DHIM moved to compel arbitration and to dismiss Ahlstrom's putative class claims, arguing that, pursuant to the FAA, the MAA applies to Ahlstrom's claims against DHIM and is not unconscionable, the class waiver is fully enforceable, the Opt-Out Provision does not render the MAA unenforceable, and, regardless, the MAA's delegation clause pertaining to everything other than class waiver issues requires the Court to compel arbitration. (ER 35-119; SER 21-208.) Ahlstrom opposed DHIM's motion based on the same flawed reading of the Opt-Out Provision that he relied on in the Prior Federal Action, contending the MAA never became effective because Ahlstrom never accepted employment with D.R. Horton. (ER 25-34.) Ahlstrom also contended, for the first time (*see* MJN, Ex. 6), that portions of Paragraphs 2 and 9 of the MAA conflicted with the MAA's delegation clause in Paragraph 6, such that there was no "clear and unmistakable" evidence of delegation. (ER 25-34.) As in the Prior Federal Action, Ahlstrom did not contend that the MAA (or the delegation clause itself) is unconscionable or otherwise unenforceable based on its terms; Ahlstrom

similarly did not provide any evidence in support of his opposition, nor did he dispute any evidence submitted by DHIM.[9] (*Id.*)

On January 16, 2020, Judge Freeman granted DHIM's motion, again sending Ahlstrom's individual claims to arbitration, dismissing his putative class claims, and, finding that there were no remaining claims outside of arbitration, dismissing the case without prejudice. (ER 16-24.) This appeal followed.

## III. SUMMARY OF ARGUMENT

The law on the enforceability of arbitration agreements pursuant to the FAA is well established. Among this legal canon are the propositions that arbitration agreements must be enforced according to their terms, that parties may properly agree to have gateway issues delegated to an arbitrator as long as the delegation is "clear and unmistakable," and that arbitration agreements must be interpreted in accordance with applicable state law that governs contracts in general.

Ahlstrom, however, has now twice attempted to get around his clear obligation to arbitrate his claims against his former employer on an individual

---

[9] In his Opposition, Ahlstrom also contended that, even if the delegation clause was effective as between signatories, that did not extend to a motion to compel brought by a non-signatory. (ER 28:28-29:3.) Ahlstrom has not raised this argument in his Opening Brief, and, by failing to do so, he has waived his right to argue this on appeal. *See, e.g.*, *Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for the first time in the reply brief are waived."); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986) ("The Court of Appeals will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief[.]").

basis by arguing against each of these principles. The District Court saw through his arguments and correctly ruled that, pursuant to the language and meaning of the parties' arbitration agreement, interpreted in accordance with binding precedent and interpretive case law, Ahlstrom's claims against DHIM must be compelled to arbitration on an individual basis and his class claims must be dismissed.

First, the MAA's delegation clause is "clear and unmistakable" in requiring that gateway issues be decided by an arbitrator, not by a court. Ahlstrom attempts to muddy the waters by relying on two specific clauses in the MAA that he contends contradict the delegation clause. But, the District Court correctly ruled, relying on precedent, that there is no conflict. In arguing this issue again on appeal, Ahlstrom pulls the two clauses out of context and reads them on their own, without the benefit of the rest of the Agreement—in violation of the rules of contract interpretation and the MAA itself, which requires that the Agreement "be construed as a whole, according to its fair meaning[.]" When the MAA is read together as a whole, it is clear that there is no conflict, and that the delegation is clear and unmistakable. The nonbinding authorities on which Ahlstrom relies are not in line with this Court's precedent.

Second, there is no legal authority that is binding on this Court holding that a delegation clause cannot properly entrust to the arbitrator the question of whether a contract was formed between the parties. The case law on which Ahlstrom relies

either does not actually stand for that proposition or is not binding on this Court. In addition, Ahlstrom's argument for why the MAA should not be enforced is not actually one related to formation; rather, it is a question of interpretation. The fact that Ahlstrom chooses to frame it as a formation question does not make it so. Ahlstrom's entire argument for avoiding the MAA actually rests upon his *misinterpretation* of the provisions of the MAA, and the MAA's delegation clause expressly states that questions of interpretation must be decided by the arbitrator—a premise that Ahlstrom does not contest.

Finally, Ahlstrom's argument that no arbitration agreement was formed between the parties because Ahlstrom did not accept employment with an affiliated company relies on a seriously strained and improper reading of the Agreement's Opt-Out Provision. As an initial matter, regardless of this Court's opinion on Ahlstrom's interpretation of the Opt-Out Provision, this question is one that is properly delegated to an arbitrator pursuant to the Agreement's delegation clause, as the District Court correctly held. But, even if the Court disagrees with that finding, there is simply nothing in the Agreement that creates a condition precedent, to formation or performance, and Ahlstrom's reliance on this Court's recent decision in *International Brotherhood of Teamsters v. NASA Services, Inc.*, 957 F.3d 1038 (9th Cir. 2020), is misplaced. When properly reviewed in accordance with the correct canons of statutory construction and California law, it

is clear that the Agreement was formed when it was signed by both parties.

Therefore, because the District Court correctly ruled that Ahlstrom's class claims should be dismissed and his individual claims should be compelled to arbitration, the District Court's decision should be affirmed.

## IV. LEGAL ARGUMENT

### A. **Because The MAA Contains A Clear And Unmistakable Delegation Clause Regarding Non-Class Action Waiver Issues, This Court Must Compel The Matter To Individual Arbitration.**

In determining whether to grant a motion to compel arbitration generally, the court's inquiry is limited to deciding two gateway issues of arbitrability: "(1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. Keybank Nat'l Ass'n*, 673 F.3d 947, 955-56 (9th Cir. 2012). However, the court does not have the authority to decide even these gateway issues where the parties have "clearly and unmistakably" delegated the arbitrability issues to the arbitrator. *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010); *Brennan v. Opus Bank*, 796 F.3d 1125, 1130-32 (9th Cir. 2015). The Ninth Circuit holds, for example, that even an arbitration agreement's incorporation of the rules of the AAA, one of which provides that "the 'arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the...validity of the arbitration agreement,'" constitutes the required "clear and

unmistakable" evidence of delegation. *Brennan*, 796 F.3d at 1130-31 (alteration in original). "An agreement to arbitrate a gateway issue [via a delegation clause] is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Ctr.*, 561 U.S. at 70.

Thus, in situations where an arbitration agreement "clearly and unmistakably" delegates gateway issues to the arbitrator, as is the case here, the district court "*only* determines whether the delegation itself is unconscionable." *Clayborne v. Lithia Motors, Inc.*, No. 1:17-cv-0588-AWI-BAM, 2017 WL 6017009, at *3 (E.D. Cal. Dec. 5, 2017); *see also Malone v. Superior Court*, 226 Cal. App. 4th 1551, 1559-60 (2014). The party opposing arbitration—here, Ahlstrom—bears the burden of proof as to any defense to arbitrability. *See Clayborne*, 2017 WL 6017009, at *4. "If the delegation of arbitrability is not unconscionable, the enforceability of the entirely ***[sic]*** arbitration agreement...will be left to the arbitrator." *Id*. at *3.

Here, Ahlstrom does not argue that either the MAA or the delegation clause is unconscionable. Instead, he claims only that the express delegation clause[10] in

[10] The MAA explicitly excludes consideration of the class waiver from the delegation clause, and states expressly that "[a]ny question or dispute concerning the scope or validity of [the class waiver] shall be decided by a court of competent jurisdiction and not the arbitrator." (ER 118, ¶¶6,7 (emphasis omitted).) Ahlstrom

Paragraph 6 is not “clear and unmistakable” due to the following two purportedly conflicting statements in the MAA, in Paragraphs 2 and 9, respectively:

- “‘[A]ctions to enforce this Agreement [or] compel arbitration’ are ‘excluded from this Agreement’” (Appellant’s Opening Brief [“AOB”], at 17 (emphases omitted) (first alteration added)); and
- “‘Similarly, should a court determine that arbitration pursuant to this Agreement is unavailable for any reason, the parties agree and stipulate that they hereby waive any right to a jury’” (*id.*).

As Judge Freeman has twice correctly found (*Ahlstrom v. DHI Mortg. Co. GP, Inc.*, No. 17-CV-04383-BLF, 2018 WL 6268876, at *3 (N.D. Cal. Nov. 30, 2018); ER 20:1-6), Ahlstrom is incorrect.

Indeed, as the District Court correctly found, the Ninth Circuit has already squarely rejected Ahlstrom’s argument that the MAA is ambiguous on delegation because of purported conflicts between the delegation clause in Paragraph 6 and the above-quoted portions of Paragraphs 2 and 9. In *Mohamed v. Uber Technologies, Inc.*, 848 F. 3d 1201 (9th Cir. 2016), the Ninth Circuit reversed the district court on the question of delegation, and found that the same types of purported conflicts in the MAA cited by Ahlstrom here are “artificial.” *Id.* at 1209.

---

has not raised any dispute about the class waiver, either in the District Court or on appeal.

In *Mohamed*, this Court specifically highlighted the venue selection provision relied upon by the plaintiffs, finding it was not in conflict with the arbitration agreement's "unambiguous" delegation statement, as the venue provision was clearly intended for the purpose of enforcing the arbitration agreement or an award, or where court action is necessary to handle claims not covered by the arbitration agreement. *Id.* ("'[N]o matter how broad the arbitration clause, it may be necessary to file an action in court to enforce an arbitration agreement, or to obtain a judgment enforcing an arbitration award, and the parties may need to invoke the jurisdiction of a court to obtain other remedies.'") (quoting *Dream Theater, Inc. v. Dream Theater*, 124 Cal. App. 4th 547, 556 (2004)). Thus, the mere fact that the MAA contains language regarding judicial enforceability of the MAA does not, in light of the binding Ninth Circuit authority on this question, vitiate the parties' agreement to delegate interpretation issues to the arbitrator.

Moreover, nothing in Paragraph 2 of the MAA indicates that a court, as opposed to an arbitrator, can issue rulings with respect to "dispute[s] relating to the formation, enforceability, applicability, or interpretation of this Agreement" (ER 118, ¶6)—simply that a party may seek recourse from a court to compel *an arbitrator* to make such rulings. In fact, the reference in Paragraph 2 to exclusion from the Agreement for actions to enforce the MAA or compel arbitration merely states the obvious—a party wishing to force another into arbitration pursuant to the

Agreement would be *required* to seek recourse from a court; an arbitrator would have no jurisdiction over a party that refused to arbitrate. Numerous district court cases are in accord. *See, e.g.*, *Gountoumas v. Giaran, Inc.*, No. CV-18-7720-JFW(PJWX), 2018 WL 6930761, at *6 (C.D. Cal. Nov. 21, 2018) ("[T]he mere inclusion of a carve-out for equitable relief does not render the 'clear and unmistakable' delegation of the unconscionability determination to the arbitrator ambiguous."); *DeVries v. Experian Info. Sols., Inc.*, No. 16-CV-02953-WHO, 2017 WL 733096, at *9 (N.D. Cal. Feb. 24, 2017) ("[T]here is no question that claims within the carve-out provision are for the court, rather than the arbitrator, to decide. But the delegation clause reserves for the arbitrator the issues of scope and enforceability. Therefore, the determination of which, if any, of DeVries's claims fall within the carve-out is an issue that the parties clearly and unmistakably delegated to the arbitrator to decide in the first instance."); *Miller v. Time Warner Cable Inc.*, No. 816CV00329CASASX, 2016 WL 7471302, at *5-6 (C.D. Cal. Dec. 27, 2016) (finding delegation was clear and unmistakable, despite a statement in the agreement that claims for injunctive relief must be brought before a court and a waiver of the right to a jury trial for any claim "'properly brought before a court'"; "Even if arbitrability is delegated to the arbitrator, that does not foreclose some claims being 'properly brought before a court,' such as claims for injunctive relief or claims that an arbitrator has found to be outside the scope of the

arbitration agreement."); *cf. also, e.g.*, *MegaCorp Logistics LLC v. Turvo, Inc.*, No. 18-CV-01240-EMC, 2018 WL 3619656, at *5-6 (N.D. Cal. July 30, 2018) ("[R]eference to a court of competent jurisdiction in one provision in the Consulting Services Agreement does not render the delegation clause of the arbitration provision ambiguous.").

Notably, in *Bayer v. Comcast Cable Communications, LLC*, No. 12-C-8618, 2013 WL 1849519 (N.D. Ill. May 1, 2013), the Northern District of Illinois found a jury trial waiver that was nearly identical to the one Ahlstrom takes issue with here did not render the delegation clause unclear or unmistakable. *See id.* at *2-3. Specifically, the "severability" clause at issue read, in full:

> If any clause within this Arbitration Provision (other than the class action waiver clause identified in Section E(2) above) is found to be illegal or unenforceable, that clause will be severed from the Arbitration Provision, and the remainder of the Arbitration Provision will be given full force and effect. If the class action waiver clause is found to be illegal or unenforceable, the entire Arbitration Provision will be unenforceable, and the dispute will be decided by a court. In the event that this entire Arbitration Provision is determined to be illegal or unenforceable for any reason, or if a claim is brought in a Dispute that is found by a court to be excluded from the scope of this Arbitration Provision, you and Comcast have each agreed to waive, to the fullest extent allowed by law, any trial by jury.

*Id.* As here, the plaintiffs in *Bayer* took issue only with the last sentence of the clause—the jury trial waiver. *See id.* As the District Court did here, however, the

*Bayer* Court correctly found that the jury trial waiver did not conflict with the delegation clause so as to render it unenforceable, resolving the alleged conflict by "interpret[ing] the agreement 'with the goal of effectuating the parties' intent, giving contract terms their plain and ordinary meaning.'" *Id.* (quoting *Kim v. Carter's Inc.*, 598 F.3d 362, 364 (7th Cir. 2010)). In performing this analysis, the court reviewed the arbitration agreements as a whole, as well as the language of the particular provisions thereof:

> When one interprets the last sentence quoted by plaintiffs within the context of the [arbitration] clause, it is clear that the parties intended that when a court determines that the court should adjudicate the arbitrality ***{sic}*** issue, despite the agreement between defendant and plaintiffs, and finds a dispute to fall outside the scope of arbitration, a right to jury trial is waived. The severability clause contains a number of potential scenarios that attempt to provide guidance in the event the arbitration clause is found to be unenforceable. These "if-then" scenarios do not dilute the broad scope of the arbitration provision, which explicitly refers to "all disputes...includ[ing] the validity, enforceability or scope of this Arbitration Provision." The arbitration agreements therefore demonstrate an intent to include the arbitrability issue within the scope of arbitration.

*Id.* at *3 (first alteration added); *contra Berk v. Coinbase, Inc.*, No. 18-CV-01364-VC, 2018 WL 5292244, at *1 (N.D. Cal. Oct. 23, 2018) (finding delegation was not clear and unmistakable in a lengthy consumer contract of which the arbitration provision was only one small part, where there was no express delegation clause, only a reference to the AAA rules that were not attached to the agreement, along

with a statement that "'If a court decides that any provision of this [arbitration clause] is invalid or unenforceable, that provision shall be severed and the other parts of this [arbitration clause] shall still apply,'" holding that "[b]ecause that instruction is necessary only if a court—and not an arbitrator—is to determine whether a dispute is arbitrable, it muddles any clear statement of delegation"). As the District Court correctly found, the same outcome is appropriate here.

Ahlstrom's attempt to distinguish this Court's precedential decision in *Mohamed* and instead rely on two non-binding California Court of Appeal decisions—*Peleg v. Neiman Marcus Group, Inc.*, 204 Cal. App. 4th 1425 (2012), and *Dennison v. Rosland Capital, LLC*, 47 Cal. App. 5th 204 (2020)—are inapposite and unsuccessful. First, *Peleg*, which predates *Mohamed* by several years, and, therefore, does not consider this Court's opinion in that case, relies on several earlier California Court of Appeal decisions and California law (rather than the FAA) to rule that a delegation provision was not clear and unmistakable. Specifically, the *Peleg* Court found a contradiction between the arbitration agreement's delegation clause, which stated, "'Any dispute concerning this Agreement—the way it was formed, its applicability, meaning, scope, enforceability, or any claim that all or part of this Agreement is void or voidable—is subject to arbitration under this Agreement and shall be determined by the arbitrator,'" and its severability clause, which stated, "'If any *court* determines that

this Agreement in its entirety shall not be *enforced*, such determination shall be effective only as to Covered Employees who reside in the state where such *court* is located, and not as to any other Covered Employees[.]'" *Peleg*, 204 Cal. App. 4th at 1441-42. The *Peleg* Court found that the two provisions were "inconsistent" because "[t]he delegation provision states that the arbitrator is to decide whether the Agreement is enforceable while the severability provision contemplates that a court has the same authority. The Agreement does not explain when an arbitrator, as opposed to a court, is to decide enforceability." *Id.* at 1444-45.

Ahlstrom likewise fails to gain support from his reliance on the California Court of Appeal's recent decision in *Dennison*, which itself relies on the same pre-*Mohamed* cases discussed in *Peleg*[11] to find that a delegation clause was not clear and unmistakable under California law where it included a severability clause stating, "'*If any provision of this Agreement is held by a court of competent jurisdiction to be void, invalid, or unenforceable*, then that provision will be enforced to the maximum extent permissible and the remaining terms and provisions of this Agreement will continue in full force and effect.'" *Dennison*, 47 Cal. App. 5th at 209-10 ("Where, as in paragraph 15.11..., a contract includes a severability clause stating a court of competent jurisdiction may excise an unconscionable provision, there is no clear and unmistakable delegation to the

[11] In fact, the *Dennison* Court does not even mention this Court's decision in *Mohamed*. *See Dennison*, 47 Cal. App. 5th 204.

arbitrator to decide if the arbitration agreement is unconscionable.”).

As discussed above, and as the District Court correctly found, no inconsistency of the type found in *Peleg* and *Dennison* is present in the MAA. In addition, unlike in *Peleg* and *Dennison*, neither of the provisions Ahlstrom takes issue with as potentially contradictory in Paragraphs 2 and 9 are severance provisions, thus making these cases inapplicable to the facts at issue here. And, moreover, unlike the severability provisions discussed in *Peleg* and *Dennison*, the modification and severance language that *is* present in the MAA makes no reference whatsoever to courts, plainly indicating (unlike the agreements in *Peleg* and *Dennison*) that ***an arbitrator*** would be the decisionmaker regarding modification or severance. (ER 118-119, ¶9 (“If any provision of this Agreement is deemed invalid or unenforceable, such provision shall be modified automatically to the minimum extent necessary to render the Agreement valid and enforceable. If a provision conflicts with a mandatory provision of applicable law, the conflicting provision shall be severed automatically and the remainder of the Agreement construed to incorporate the mandatory provision.”).)

Thus, in light of the binding Ninth Circuit precedent set out in *Mohamed* and the other applicable authorities discussed above, the District Court correctly found that the MAA’s delegation clause is clear and unmistakable, and is unencumbered by the language Ahlstrom cites in Paragraphs 2 and 9. As a result, since the

MAA's delegation clause is not unconscionable (and Ahlstrom has made no attempt to argue that it is), regardless of how this Court views Ahlstrom's tortured arguments discussed below, it must uphold the District Court's Order and compel the matter to individual arbitration.

### B. Contract Formation May Properly Be Delegated To An Arbitrator.

Relying primarily on several out-of-circuit authorities, Ahlstrom contends that, even where the delegation is clear and unmistakable, parties to arbitration agreements may not delegate issues of contract *formation* to an arbitrator, and, thus, formation issues must always be decided by a court. Ahlstrom is incorrect and the cases on which he relies are inapplicable.

None of the cases on which Ahlstrom relies in fact hold that contract formation must be reserved for the court even in the presence of a clear and unmistakable delegation clause. First, the out-of-circuit cases on which Ahlstrom relies base their determinations that formation cannot be delegated at least in part on the Supreme Court's decision in *Rent-A-Center*. *See Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1105-07 (2020); *In re: Auto. Parts Antitrust Litig.*, 951 F.3d 377, 385 (6th Cir. 2020); *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 202 (5th Cir. 2016); *Edwards v. Doordash, Inc.*, 888 F.3d 738, 743-44 (5th Cir. 2018). *Rent-A-Center*, however, did not address whether the question of contract formation could properly be delegated to an arbitrator. *See Rent-A-Ctr.*, 561 U.S. at 71 n.1

(“The issue of the agreement’s ‘validity’ is different from the issue whether any agreement between the parties ‘was ever concluded,’ and...we address only the former.”). Similarly, neither the Supreme Court’s decision in *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287 (2010), nor this Court’s decision in *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979 (9th Cir. 2017), dealt with the question of delegation at all.

In addition, Ahlstrom’s reliance on the Tenth Circuit’s very recent decision in *Fedor v. United Healthcare, Inc.*, is misplaced. In *Fedor*, the Court held that the plaintiff’s challenge to the parties’ 2016 arbitration policy would have to be heard by a court, not an arbitrator. *Fedor*, 976 F.3d at 1106-07. The Court held that, by claiming that she “never saw or agreed to any aspect of the 2016 arbitration policy,” the plaintiff had raised an issue of contract formation that “inherently call[ed] into question whether she agreed to the delegation clause within the policy”; thus, the formation issue could not be delegated to an arbitrator. *Id.*

Here, however, no such formation issue is truly present, and, although Ahlstrom calls his dispute one of “formation,” he is attempting to elevate form over substance. Indeed, unlike the plaintiff in *Fedor*, Ahlstrom has never claimed that he never saw or agreed to the MAA, even explicitly acknowledging in his Opening Brief that he accepted the MAA when he signed it. (AOB, at 26.) In fact, as the District Court correctly acknowledged (ER 24:5-12), the issue Ahlstrom

raises with the Opt-Out Provision, as discussed below, is actually one of interpretation—one that is squarely within the realm of a properly delegable issue.[12]

Finally, Ahlstrom argues that this Court must find that formation questions cannot be delegated to an arbitrator because an alternative outcome would result in potential absurdities arising out of arbitrators' purported financial interests in finding that an arbitration agreement exists, so that they can then earn fees in ruling on the merits of the dispute. Ahlstrom's slippery slope concerns are simply uncalled for, and public policy arguments of this type have been repeatedly rejected by the Supreme Court as contrary to the FAA and controlling precedent. *See, e.g.*, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529-31 (2019) (rejecting the "wholly groundless" exception to application of a valid delegation clause as inconsistent with the FAA and precedent). The FAA and interpretive case law are clear—arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. If Ahlstrom did not trust that an arbitrator would act neutrally in ruling on his claims, he could have opted out of the MAA. He did not do so, and is therefore bound by his decision.

[12] In light of this distinction, this Court can properly rule on the instant appeal without addressing whether the question of formation must always be one reserved for a court.

### C. <u>**Even If Contract Formation May Not Be Delegated, The District Court Did Find A Contract Was Formed.**</u>

Assuming, *arguendo*, that the question of contract formation is one that must be reserved for the court, even in the presence of a clear and unmistakable delegation clause like the one in the MAA, the District Court *did* find that a valid contract was formed. Specifically, Judge Freeman held:

> Ahlstrom also argues that he did not accept the MAA because he did not comply with both requirements in the MAA's opt-out provision, and therefore his acceptance was never effective… The Court already rejected this argument before [in its ruling in the Prior Federal Action], and it does so again here. "Ahlstrom accepted the MAA when he signed on the dotted line. By its very name and nature, the 'opt-out' provision provided an opportunity for Ahlstrom to opt out of his previously rendered acceptance."

(ER 24:5-10 (quoting *Ahlstrom*, 2018 WL 6268876, at *3).)

The above statement unquestionably comprises a finding by Judge Freeman that a contract was formed between the parties when Ahlstrom signed the MAA.[13]

### D. <u>**All Of The Elements Of A Contract Are Present, And Ahlstrom Has Failed To Provide Evidence To The Contrary.**</u>

Further, even if this Court were to find both that a formation finding must be made first by a court *and* that the District Court here did not make such a finding,

---

[13] Notably, Ahlstrom has never contended that no contract was formed because DHIM or D.R. Horton did not accept the agreement; he has only ever contested *his own* acceptance. Thus, the acceptance of the other party to the Agreement is not in dispute.

it is clear that DHIM has established the existence of a valid agreement to arbitrate, and that Ahlstrom has provided no evidence to the contrary.

"To determine whether the parties formed an agreement to arbitrate, courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1041 (9th Cir. 2020) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Under California law, the moving party—here, DHIM—must "prove by a preponderance of the evidence that an agreement to arbitrate exists." *Id.* There is no question that this standard is met here.

In California, the four elements of a contract are "1. Parties capable of contracting; 2. Their consent; 3. A lawful object; and, 4. A sufficient cause or consideration." Cal. Civ. Code § 1550. The element of consent is often described as "mutual assent," which "usually is manifested by an offer communicated to the offeree and an acceptance communicated to the offeror." *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 270-71 (2001); *see also* Cal. Civ. Code § 1565 ("The consent of the parties to a contract must be: 1. Free; 2. Mutual; and, 3. Communicated by each to the other."); *Kum Tat*, 845 F.3d at 984 ("'Contract formation requires mutual consent, which cannot exist unless the parties agree upon the same thing in the same sense.'") (quoting *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 208 (2006)). "The objective manifestation of the party's assent ordinarily controls, and

the pertinent inquiry is whether the individual to whom the communication was made had reason to believe that it was intended as an offer." *Donovan*, 26 Cal. 4th at 271; *see also, e.g.*, *Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007) ("Mutual assent is determined from the reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understandings.").

As this Court has recently noted, "'[m]utual assent may be manifested by written or spoken words, or by conduct,'" and "acceptance of contract terms may be implied through action or inaction[.]" *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (quoting *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999)). It is the job of the courts to "determine whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement." *Id.*

Here, there can be no doubt that all of the elements of a contract are present. The MAA—a mutual agreement to arbitrate disputes that might arise in connection with the parties' employment relationship—was entered into by Ahlstrom, a competent adult with a high school diploma or GED applying for a job with DHIM as a Mortgage Loan Originator, and DHIM, a corporate entity. (ER 110-111, ¶¶2, 7-8; ER 114-115, 117-119.) Both parties signed the MAA on July 24, 2015. (ER 111, ¶8; ER 119.) And, the voluntary, mutual agreement to arbitrate claims against

each other is unquestionably a lawful object for which the MAA provides sufficient consideration. *See* 9 U.S.C. § 2; *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 115 (2000) ("Arbitration is favored in this state as a voluntary means of resolving disputes, and this voluntariness has been its bedrock justification."); *Garner v. Inter-State Oil Co.*, 52 Cal. App. 5th 619, 625 (2020) (finding sufficient consideration in an arbitration agreement where "the parties made mutual, obligating promises to arbitrate").

Ahlstrom has provided no evidence or argument to the contrary. In fact, in his Opening Brief, Ahlstrom himself acknowledges that he "did accept the arbitration agreement by signing it[.]" (AOB, at 26.) Thus, this Court should find, as the District Court did, that an arbitration agreement was formed.

### E. <u>The MAA's Opt-Out Provision Does Not Vitiate Ahlstrom's Prior Acceptance Of The Agreement.</u>

Contrary to logic and his own admission, Ahlstrom argues that, irrespective of the standard formation issues discussed above, no contract was formed because the Opt-Out Provision was a condition precedent to formation that never came to fruition, thus, no agreement was formed. Ahlstrom is incorrect.

#### 1. The Language Of The MAA And The Opt-Out Provision Within It Are Clear In Their Meaning And Purpose.

As stated above, Paragraph 11 of the MAA contains the language expressly permitting Ahlstrom to opt out of the MAA. (ER 119, ¶11.)

However, the Opt-Out Provision does not, by its terms, provide that failing to return the Opt-Out Form and then working for "the Company" constitutes the *exclusive* method for accepting the MAA. (*See id.*) Indeed, the plain meaning and language of the paragraph provides that it is a method for *opting out* of a *previously accepted agreement*. The final sentence of the paragraph ("If Employee does not deliver the executed form within 30 days, and if Employee accepts or continues employment with the Company after that date, he or she shall be deemed to have accepted the terms of this Agreement") is informational, stating one result if the employee does not opt out *and* continues working at D.R. Horton. Neither the Opt-Out Provision nor any other part of the MAA says anything about what happens if the employee does not opt out and is working for an entity other than D.R. Horton. (*See id.*) The only logical result is that if the employee *does not opt out*, he remains bound by his original acceptance of the MAA.

**2. Applicable Principles Of Contract Interpretation Do Not Favor The Absurd Outcome Proposed By Ahlstrom.**

Ahlstrom's baseless alternative reading is of no merit and would have the Court read the last sentence of the Opt-Out Provision as creating an absolute, exclusive condition that overrides every other provision of the MAA—something disfavored by California law and without basis in the actual language of the Agreement. *See, e.g., Pac. Corporate Group Holdings, LLC v. Keck*, 232 Cal. App. 4th 294, 312 (2014) (holding that "[t]he jury could have reasonably found

that Keck's return of the signed letter would be an *acceptable* form of evincing his assent to the agreement, but that the provision did not *mandate* that such return was the only possible form of acceptance," as the agreement at issue "'request[ed]' that Keck indicate his acceptance by returning the letter signed; it did *not* state that Keck's return of the signed letter was the only possible manner by which he could indicate his assent to the agreement") (second alteration in original); *Broome v. Broome*, 104 Cal. App. 2d 148, 157 (1951) ("A contract must, if possible, be given a reasonable rather than an unreasonable construction."); *Retsloff v. Smith*, 79 Cal. App. 443, 453 (1926) (holding that courts do not prefer interpretations that are "extremely technical and literal and without reference to what the parties intended and would entail a forfeiture"); Cal. Civ. Code § 1643 ("A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties."); *id.* § 3541 ("An interpretation which gives effect is preferred to one which makes void."). In line with the explicit provisions of the MAA, its purpose should be ascertained from a *common sense* meaning of the contract as a whole, "with a view to effectuate the mutual intention of the parties." *Broome*, 104 Cal. App. 2d at 157; *see also Powertech Tech. Inc. v. Tessera, Inc.*, No. 4:10-CV-00945-CW, 2014 WL 2538973, at *3 (N.D. Cal. June 5, 2014) (same); Cal. Civ. Code §§ 1636, 1641.

The California Court of Appeal in *Sy First Family Ltd. Partnership v. Cheung*, 70 Cal. App. 4th 1334 (1999), provides an example of how, "where practicable, the meaning of an agreement must be derived from a reading of the whole contract," and that, "[w]hen an inconsistency exists in the language of a contract, courts must give effect to the parties' main purpose." *Id.* at 1342; *see also* Cal. Civ. Code § 1653 ("Words in a contract which are wholly inconsistent with its nature, or with the main intention of the parties, are to be rejected."). In *Sy*, the court determined that a stipulation between the parties (specifically, whether the parties had meant to use the "judicial reference" procedure or, instead, an arbitration) was ambiguous because (a) it was entitled "reference" and repeatedly cited the California Civil Procedure Code section applicable to references; but also (b) used the term "arbitrators" and "arbitration," as well as noting that the AAA's Commercial Arbitration Rules would dictate. *See Sy*, 70 Cal. App. 4th at 1342. Nonetheless, the *Sy* court ultimately determined that, based on a reading of the whole agreement, the stipulation was intended to provide for arbitration, despite the explicit use of the term "reference" and citation to related sections of the Civil Procedure Code. *See id.* at 1342-44.

Similarly, here, it can be argued that the use of the term "the Company" in the Opt-Out Provision was ambiguous, but was intended to mean whichever company employs Ahlstrom, as the first paragraph of the MAA clearly states that

all claims between the "Employee" and the Company, *as well as its subsidiaries and affiliates*, shall be arbitrated, and the MAA was signed by a representative of DHIM. (ER 111, ¶8; ER 117, ¶1.) Alternatively, it can be argued that the initial definition of "the Company" is ambiguous and was intended to encompass subsidiaries and affiliates of D.R. Horton, given that the clear and explicit purpose of the MAA is to provide for arbitration of all claims by the employee against D.R. Horton and its subsidiaries, affiliates, and others.

Courts also look towards preventing absurdity in contractual interpretation. *See* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."). In *Cortez v. Doty Brothers Equipment Co*., 15 Cal. App. 5th 1 (2017), the California Court of Appeal held that, although it was "clear and unmistakable" that the arbitration agreement only stated that claims "arising under" Wage Order 16 were subject to the arbitration, and the Labor Code was not mentioned, the Court could not "disregard the reality that an employee may enforce the protections of the wage order in court only by bringing a claim under the Labor Code." *Id.* at 14. As applied to the facts here, and to the opt-out procedure specifically, the reality is that the MAA contemplated employment with the *actual employer* as sufficient for establishing Ahlstrom's acceptance of the MAA. (ER 111, ¶8; ER 117-119.)

### 3. Judge Freeman Has Twice Correctly Ruled Against Ahlstrom's Proposed Reading, And The Case Law On Which He Relies To Show The Existence Of A Condition Precedent Is Inapposite.

Judge Freeman has now twice correctly ruled against Ahlstrom's flawed interpretation of the MAA and Opt-Out Provision, first in the Prior Federal Action, finding that Ahlstrom "accepted the MAA when he signed on the dotted line," and that "[b]y its very name and nature, the 'opt-out' provision provided an opportunity for [Ahlstrom] to opt out of his previously rendered acceptance" (*Ahlstrom*, 2018 WL 6268876, at *3), and then again in this case (ER 24:5-12).

Faced with this problem, Ahlstrom relies heavily on this Court's recent decision in *Teamsters*, attempting to show that the Opt-Out Provision sets forth an unsatisfied condition precedent to formation. His reliance, however, is misplaced. In *Teamsters*, NASA Services, Inc. ("NASA"), a waste management company, signed a Labor Peace Agreement ("LPA") with Teamsters Local 396 ("Local 396") in connection with a desire by NASA to become a franchisee for the City of Los Angeles with respect to waste management. *See Teamsters*, 957 F.3d at 1040. The LPA included an arbitration clause broadly covering "any disputes over its interpretation or application," but the LPA's terms were "'expressly conditioned'" on the City and NASA entering into an exclusive franchise agreement by December 31, 2016. *Id.* The City signed the franchise agreement with NASA on January 31, 2017. *See id.* The dispute in *Teamsters*, therefore, revolved around

whether an agreement was ever formed between NASA and Local 396. *See id.* at 1040-41.

The district court found that the LPA was "ambiguous as to whether it contained a condition precedent to formation or to performance," and, considering extrinsic evidence, it concluded that it must be a condition precedent to performance, as conditions precedent to formation are comparatively disfavored. *Id.* at 1041. As a result, the district court concluded that the LPA's arbitration clause was severable, and sent the matter to arbitration for the arbitrator to determine whether the City and NASA had entered into a franchise agreement by December 31, 2016. *See id.*

On appeal, this Court examined whether a contract ever existed between NASA and Local 396, applying general principles of California contract law (many of the same principles discussed in detail elsewhere herein). *See id.* at 1042. The Court discussed, at length, the distinction between a condition precedent to formation and a condition precedent to performance, and then examined the precise language of the LPA to determine whether the document contained a condition precedent to formation, eventually deciding that the language of the LPA contained a condition precedent to formation that was "both ascertainable and lawful." *See id.* at 1042-50. Thus, according to this Court, the LPA was only a proposed agreement until the condition precedent—the entry of NASA into a

franchise agreement with the City by December 31, 2016—had been satisfied; the condition had never been satisfied because the franchise agreement was not signed until January 31, 2017; and, therefore, arbitration could not be compelled because no contract was ever formed. *See id.* at 1049-50.

In reaching this result, this Court held that the district court had reached its incorrect conclusion by "read[ing] the contract's terms in the abstract, constru[ing] them against [the drafter], and creat[ing] the conflict it deemed irreconcilable," thereby "arriv[ing] at a superficial understanding of the words it deemed troubling," and making "no attempt to harmonize all the LPA's provisions"—in other words, "appl[ying] interpretive canons out of order" and violating the "'primary rule'" of contract interpretation under California law to "give effect to the parties' mutual intent gathered from the *entire* document." *Id.* at 1045-46 (quoting *Ajax Magnolia One Corp. v. S. Cal. Edison Co.*, 167 Cal. App. 2d 743, 748 (1959)). Thus, when this Court was "[a]rmed with the proper contract interpretation canons properly ordered," it could correctly analyze the LPA anew, and find that the language of the agreement created a condition precedent to formation that was never satisfied. *Id.* at 1046-50.

Of particular consequence to this Court, Paragraph 1 of the LPA stated "that the 'terms of this Agreement ***shall only become operative if all of the conditions set forth in paragraph 15 [related to the creation of the franchise agreement] are***

***satisfied***.'" *Id.* at 1044 (emphasis added). According to the Court, "[t]his language clearly and unambiguously makes Paragraph 15's stipulations a condition precedent to formation." *Id.* ("Paragraph 1 is clear: the LPA contains a condition precedent to formation, not performance."). In addition, Paragraph 15 itself stated, in pertinent part:

> "***All of the paragraphs of [the LPA] are expressly conditioned*** on the City of Los Angeles entering into an exclusive franchise agreement or franchise agreements with [NASA] for the collection of solid waste[.] … ***If the City fails*** to enter into an exclusive franchise agreement for the collection of solid waste with [NASA] by December 31, 2016, ***then [the LPA] shall become null and void***."

*Id.* at 1044-45 (emphases added).

No such language is present in the MAA. Here, unlike the clear language in *Teamsters* creating an undeniable condition precedent, it is clear that the Opt-Out Provision on which Ahlstrom relies is quite obviously *not* a condition precedent of any type. *See id.* at 1043 ("'[A] condition precedent is either...an uncertain event that must happen before the contractual right accrues or the contractual duty arises.'...'The existence of a condition precedent normally depends upon the intent of the parties as determined from the words they have employed in the contract.'") (quoting *Platt Pac., Inc. v. Andelson*, 6 Cal. 4th 307, 313 (1993); *Realmuto v. Gagnard*, 110 Cal. App. 4th 193, 199 (2003)) (third alteration added). There is no mandatory language in the Opt-Out Provision (or anywhere else in the MAA) of

the type present in the *Teamsters* LPA that, for example, makes clear that the MAA will *only* be effective if the employee *both* does not timely opt out *and* accepts employment specifically with D.R. Horton. (ER 119, ¶11.) As the district court incorrectly did in *Teamsters*, here, Ahlstrom is applying interpretive canons out of order and failing to give effect to the parties' mutual intent, as gathered from the MAA as a whole. *See Teamsters*, 957 F.3d at 1042 ("'It is a primary rule of interpretation that contracts must be construed as a whole[,] that is, from their four corners, and the intention of the parties is to be collected from the entire instrument and not detached portions thereof, it being necessary to consider all of the parts to determine the meaning of any particular part as well as of the whole. Individual clauses and particular words must be considered in connection with the rest of the agreement, and all of the writing and every word of it will, if possible, be given effect.'") (quoting *Ajax*, 167 Cal. App. 2d at 748) (alteration in original).

As discussed elsewhere herein, the intent of the parties is clear from reading the MAA as a whole—the parties intended to enter into a binding agreement through which Ahlstrom agreed to individual arbitration of all claims against his employer, DHIM, and other related entities and individuals. *See id.* at 1043 (noting that, when considering whether language of a contract is a condition precedent, "[p]arty intent remains paramount"). Pulling out a single sentence appearing on the third page of a three-page document—the last sentence of the

Opt-Out Provision (ER 117-119)—and relying on that alone to counter the plain meaning consistently demonstrated throughout the remainder of the Agreement, is, quite simply, the exact same mistake the district court made, and this Court rejected, in *Teamsters*. *See Teamsters*, 957 F.3d at 1044 ("'[C]ourts will not strain to create an ambiguity where none exists.'... Nor is '[t]he language of a contract...made ambiguous simply because the parties urge different interpretations.'") (quoting *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18-19 (1995); *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)) (third and fourth alterations in original).

In addition to *Teamsters*, Ahlstrom cites for support *Hillsborough LLC v. Marcus & Millichap Real Estate Investment Brokerage Co.*, No. E038589, 2006 WL 2501580 (Cal. Ct. App. Aug. 30, 2006), which he claims stands for the proposition that where a contract "***does*** prescribe the manner acceptance is to be communicated," no other manner of acceptance is sufficient. *Id.* at *4 (emphasis added). *Hillsborough* is unpublished and is distinguishable on its facts. In *Hillsborough*, the contract at issue dictated that:

> "The commencement date of this contract shall be the date [the broker] receives this executed Representation Agreement from all Sellers *and countersigns this Representation Agreement*. Termination date shall be one hundred eighty (180) days (six months) from commencement date. [The broker] shall deliver written notification to seller of exact commencement date and termination date with fully executed contract."

*Id.* at *1 (alterations in original). However, in *Hillsborough*, the broker never "countersigned," such that there was no date of "commencement" of the contract, and, thus, "no contract was formed." *Id.* at *4. On top of that, the Court noted that the broker never showed that it had complied with the further condition to deliver written notice to the seller of the commencement and termination dates. *Id.*

*Hillsborough*, too, is inapposite. The contract in *Hillsborough* stated that the contract *would not commence* until the broker countersigned the agreement. *Id.* at *1. The broker did not countersign, so no contract was ever formed. *Id.* at *4. In finding there was no contract, the Court relied upon the same type of distinction drawn by the Court of Appeal in *In re Crossman's Estate*, 231 Cal. App. 2d 370 (1964), between (1) an offer "which makes a 'positive requirement'. . . or imposes 'an absolute condition'. . . of a specified manner of acceptance"; and (2) an offer "which 'merely suggests a permitted...manner'" of acceptance, and where "another method of acceptance is not precluded." *Id.* at 372 (internal citations omitted) (final alteration in original). In *Hillsborough*, the language of the contract was specific and mandatory: there could not be a contract until the broker countersigned the agreement. *See Hillsborough*, 2006 WL 2501580, at *1, *4; *see also Roth v. Garcia Marquez*, 942 F.2d 617, 619-20, 626-27 (9th Cir. 1991) (holding that a condition precedent was created with contractual language stating "'***The option shall commence upon signature*** by Gabriel Garcia Marquez to the

formal agreement and the return of said signed agreement to me or Richard Roth, at which time the option payment shall be made to you as agent for Gabriel Garcia Marquez,'" such that "Garcia Marquez' signature was required for the contract to be binding") (emphasis added).

In the instant action, on the other hand, the "opt-out" nature of the MAA means that there was a contract ***once*** Ahlstrom signed it ***unless*** he properly *opted out of it*. (ER 119, ¶11.) Since Ahlstrom did not opt out (*see* ER 111-112, ¶9), the MAA remained in force. Hence, the MAA falls in the latter category described by *Crossman—i.e.*, suggesting a permitted manner of acceptance, but not precluding others. *See Crossman*, 231 Cal. App. 2d at 372; *see also Ahlstrom*, 2018 WL 6268876, at *3 ("The plain language [of the Opt-Out Provision] instead reinforces that failure to opt out will constitute continued acceptance—or, put another way, that opting out is the only way to *terminate* acceptance. This language is not ambiguous and in no way denotes an exclusive means of acceptance.").

Ahlstrom further argues that the language in *Artukovich v. Pacific States Cast Iron Pipe Co.*, 78 Cal. App. 2d 1, 3 (1947), that "the provision in an offer specifying a means of acceptance is for the benefit of the offerer ***[sic]*** and may be waived by him," is inapplicable here, and that the benefit here is to the plaintiff. Whether the benefit is related to the MAA or the Opt-Out Provision (although DHIM maintains that it is the former) is ultimately insignificant; even the Court in

*Crossman* considered and then disregarded this issue, looking only at whether the language of the contract precluded other means of acceptance. *See id.* at 3-4 (finding a contract was binding as executed by the manager of the Los Angeles office, even though the contract stated that it "must be subject to the approval of the Vice-President, Treasurer, or General Sales Manager of the Pacific States Cast Iron Pipe Company at Provo-Utah").

In *Crossman*, the agreement provided that "[a]ny notice that either party hereto desires or shall be required to give to the other hereunder shall be given in writing, either delivered personally or sent by prepaid registered mail." 231 Cal. App. 2d at 371. The appellant telephoned the other party to state the agreement was being exercised, and then sent a letter by *regular* mail the next day. *Id*. The appellant later took the position that because the letter was not sent by registered mail, the agreement was not binding. *Id*. The Court disagreed, explaining the distinction between the two types of offers (discussed above) and noting that "it is frequently necessary to look beyond the literal meaning of the language used." *Id*. at 371-72.

Similarly, in *Devencenzi v. Donkonics*, 170 Cal. App. 2d 513 (1959), the California Court of Appeal held, in accordance with California Civil Code section 1582, that an offer letter stating, "If this is agreeable to you please sign the two copies [of the enclosed agreement]," did not make the signing of the letter either a

"condition" or the "only" mode of acceptance of the offer; rather, the offer "only suggested a method which would be satisfactory" to the offeror, and providing a separate written acceptance would also have sufficed to create a contract. *Id.* at 514, 518; *see also Keck*, 232 Cal. App. 4th at 310-13 (agreeing with *Devencenzi*, and holding that "[t]he jury could have reasonably found that Keck's return of the signed letter would be an *acceptable* form of evincing his assent to the agreement, but that the provision did not *mandate* that such return was the only possible form of acceptance"). Instead, the Court held that, despite the language in the offer letter, the offeree had properly accepted the agreement through a completely separate writing. *Devencenzi*, 170 Cal. App. 2d at 515; *see also Ahlstrom*, 2018 WL 6268876, at *3; *Crossman*, 231 Cal. App. 2d at 372.

Further, to the extent Ahlstrom relies on *Dexter v. Ankiewicz*, 26 Cal. App. 2d 326 (1938), his reliance is misplaced, as the facts of the case are completely dissimilar to those at issue here. In *Dexter*, the Court addressed whether a continuous written exchange between the parties over the course of approximately seven months constituted acceptance of a contract. *Id.* at 327-34. The plaintiff in *Dexter*—on five separate occasions—asked the defendant, who had merely once stated he was "willing to sign and return" the contract, to, in fact, sign and return the contract. *Id.* The defendant never did so, and the Court held that no contract existed because both parties had clearly contemplated a written, signed agreement

as necessary for acceptance. *See id.* at 333 ("Where the parties understand that before a contractual relationship shall exist the terms of their contract are to be reduced to writing and signed by them, a binding or completed contract does not arise until a writing evidencing the terms of their agreement has been executed by the respective parties.... In the instant case it is clear...that both plaintiff and defendant contemplated that acceptance by defendant of plaintiff's offer should be signified by defendant's signing and returning the contract[.]").

Here, the Opt-Out Provision did not create an absolute condition or the only mode by which acceptance of the MAA would be complete.[14] As a result, signing the MAA, or employment with DHIM, for example, would constitute another method of acceptance acceptable to the offeror. In fact, the Opt-Out Provision does not, by its terms, provide that failing to return the Opt-Out Form and then working for "the Company" constitutes the exclusive method for accepting the MAA. (ER 119, ¶11.) Indeed, as stated above, the plain meaning of the Opt-Out Provision is

---

[14] These propositions are also consistent with case law in other contexts that has examined "sufficient" and "necessary" conditions in their logical relationship. *See California v. Hodari D.*, 499 U.S. 621, 627-28 (1991). The Opt-Out Provision in the MAA simply provides an explanation to the employee that not delivering an Opt-Out Form and acceptance/continued employment is *sufficient* to constitute acceptance; the provision does not, by its plain language, establish that these are *necessary conditions* for acceptance of the Agreement. (ER 119, ¶11.) In contrast, a necessary condition could have been created if the language were: "*Only* if Employee does not deliver the executed form within 30 days and Employee accepts or continues employment with the Company after that date, he or she shall be deemed to have accepted the terms of this Agreement." That is plainly not what the MAA says.

*not* that it sets forth a condition precedent, but that it provides for a method for opting out of a previously accepted agreement.[15] (*See id.*) The only logical result is that if the employee signs the MAA and does not opt out, as is the case here, he remains bound by his original acceptance.

In short, Ahlstrom accepted the MAA when he signed it on July 24, 2015. (ER 110-111, ¶¶3-8; ER 117-119.) Ahlstrom did not exercise his opt-out right. (ER 111-112, ¶9.) Accordingly, the MAA is and remains binding upon Ahlstrom.

#### 4. The Rule Of Interpretation Against The Drafter Is Inapplicable.

Ahlstrom also relies on California Civil Code section 1654 ("Section 1654"), which provides: "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ. Code § 1654. This rule is inapplicable here for at least three independent reasons.

First, the Supreme Court recently reiterated that the FAA, not any canon of construction, provides the default rule where there is ambiguity in an arbitration provision. *See Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418-19 (2019); *see*

---

[15] It can also be argued that Ahlstrom's employment with DHIM constituted acceptance *of the consideration* for the MAA, and either performance or acceptance of consideration each, on their own, constitute acceptance of a contract. *See Estate of Klauenberg,* 32 Cal. App. 3d 1067, 1070 (1973) ("Performance and acceptance of the consideration constitute alternate modes of acceptance[.]"); Cal. Civ. Code § 1584 ("Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal.").

*also Revitch v. DIRECTV, LLC*, No. 18-16823, 2020 WL 5814095, at *5 (9th Cir. Sept. 30, 2020) ("The problem with *contra proferentem*, according to the Supreme Court, is that it is a 'default rule' that is 'triggered only after a court determines that it *cannot* discern the intent of the parties.'") (quoting *Lamps Plus*, 139 S. Ct. at 1417). Thus, this canon of construction is preempted by the FAA where the two are in conflict. *See Lamps Plus*, 139 S. Ct. at 1417-19. Here, the outcome Ahlstrom urges by asking the Court to apply this canon of construction would be inconsistent with the FAA's mandate that "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." *Id.* Therefore, the FAA—including its presumption of arbitrability—not Section 1654, governs interpretation of the MAA.

Second, the terms of the MAA explicitly contract around Section 1654. In its first full paragraph, the MAA clearly establishes that

> Employee and the Company both agree all legal disputes and claims between them, including without limitation those relating to Employee's *employment* with the Company or any separation therefrom and *claims by Employee against the Company's parents, subsidiaries, affiliates,* directors, employees, or agents, shall be determined exclusively by final and binding arbitration[.]

(ER 117, ¶1 (emphasis added).) The MAA also states that it "***shall be construed as a whole, according to its fair meaning***," and that "If any provision...is deemed invalid or unenforceable, such provision shall be modified automatically to the

minimum extent necessary to render the Agreement valid and enforceable." (ER 118-119, ¶¶9,10 (emphasis added).)

When the MAA is "construed as a whole, according to its fair meaning," it is clear that its purpose is that in exchange for Ahlstrom to begin or continue employment with DHIM, he would agree to arbitrate "all legal disputes and claims" against D.R. Horton *and* any and all "parents, subsidiaries, affiliates, directors, employees, or agents." (ER 117, ¶1.) Construing the fair meaning of the Agreement does not lead to the conclusion that, as a result of the Opt-Out Provision, the MAA—which, again, was executed by both Ahlstrom and an employee of DHIM (ER 111, ¶8; ER 119)—would apply *only* if Ahlstrom were employed only by D.R. Horton, but not a subsidiary or affiliate. At the very least, subsidiaries and affiliates are clearly established in the MAA as third-party beneficiaries, and a fair meaning of the Opt-Out Provision cannot be that if Ahlstrom were employed by a subsidiary or affiliate instead of the parent company, that the entire agreement as a whole would be unenforceable. In fact, construed as a whole, the last sentence of the Opt-Out Provision is even superfluous, and the paragraph could have been limited to the first sentence: "Employee may opt-out of this Agreement by delivering, within 30 days of the date this Agreement is provided to Employee, a completed and signed Opt-Out Form to the Company's senior Human Resources officer at the Company's headquarters." (ER 119, ¶11.)

Third, by its own language—"In cases of uncertainty not removed by the preceding rules" (Cal. Civ. Code § 1654)—Section 1654 is limited in application to circumstances under which other rules of contract interpretation in the preceding part of the chapter cannot resolve the issue.[16] Moreover, Section 1654 "is not determinative when the contract may be properly construed by application of other rules of construction." *B. L. Metcalf Gen. Contractor, Inc. v. Earl Erne Inc.*, 212 Cal. App. 2d 689, 695-96 (1963) (declining to apply Section 1654 to interpretation of an arbitration agreement, noting that even though the defendant in the case did not want to arbitrate, "in a contract involving the identical language and involving a similar set of facts another defendant might well prefer to have arbitration," noting that "[i]t is not the meaning in section 1654 that the construction to be indulged in is that which one of the parties wants at the time"). It is precisely the case here that other rules of construction—including others cited in Ahlstrom's Opening Brief and discussed herein—take precedence over Section 1654.

Finally, the MAA is not uncertain or ambiguous. *See Ahlstrom*, 2018 WL 6268876, at *3 (finding that the language of the Opt-Out Provision "is not

[16] The provisions in the California Civil Code setting forth the contract interpretation rules are contained in a chapter titled "Interpretation of Contracts," which currently runs from Section 1635 to Section 1663. Among the sections preceding Section 1654 is California Civil Code section 1643, which provides: "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." Cal. Civ. Code § 1643.

ambiguous”); *Lamps Plus*, 139 S. Ct. at 1414-15 (“In California, an agreement is ambiguous ‘when it is capable of two or more constructions, both of which are reasonable.’”) (quoting *Varela v. Lamps Plus, Inc.*, 701 Fed. Appx. 670, 672 (9th Cir. 2017). Here, as discussed, there is only one reasonable construction of the MAA and Opt-Out Provision. Thus, Section 1654 does not apply.

These principles were recently reiterated by this Court:

> Local 396 correctly notes that ambiguous contract provisions should be construed against the drafter…. But that rule of construction applies only where contract language is ambiguous and unresolved by the more fundamental principles of interpretation…. Foremost among those preceding principles, for our purposes, is the mandate that contracts be construed as a whole.

*Teamsters*, 957 F.3d at 1042-43.

Ahlstrom signed the MAA and did not opt out—there is no reasonable alternative construction. (ER 110-112, ¶¶3-9; ER 117-119.) He therefore remains obligated to arbitrate his claims against DHIM on an individualized basis.

## V. CONCLUSION

Ahlstrom entered into an enforceable, mutually binding arbitration agreement that governs all of his claims against DHIM, his prior employer, that are at issue in this action. Ahlstrom’s failure to work for *D.R. Horton* did not vitiate his *prior acceptance* of the MAA, in which he agreed to arbitrate all claims he might possess against D.R. Horton and/or any of its subsidiaries and/or affiliates—

including DHIM. As Ahlstrom *only* takes issue with the clarity of the delegation clause and the interpretation of the Opt-Out Provision, there is no basis to find that the MAA is anything other than an enforceable agreement to arbitrate Ahlstrom's claims against DHIM on an individual basis.

Accordingly, the district court properly compelled Ahlstrom to arbitrate his claims against DHIM on an individualized basis, dismissed Ahlstrom's putative class and collective action allegations, and dismissed the instant action to permit the parties to complete arbitration, and its decision should be affirmed in its entirety.

DATED: November 2, 2020 *Respectfully submitted.*

By: /s/ Jennifer L. Katz
Jack S. Sholkoff
Jennifer L. Katz
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

Attorneys for Defendant-Appellee
DHI MORTGAGE COMPANY, LTD., L.P.

## STATEMENT OF RELATED CASES

DHIM is currently unaware of any cases related to this action pending in this Court, as defined in Circuit Rule 28-2.6.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,999 words, excluding the parts of the brief exempted by the Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in a 14-point Times New Roman font (a proportionally-spaced font).

DATED: November 2, 2020

By: /s/ Jennifer L. Katz
Jack S. Sholkoff
Jennifer L. Katz
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

Attorneys for Defendant-Appellee
DHI MORTGAGE COMPANY, LTD., L.P.

9th Circuit Case Number(s) 20-15114

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

*********************************************************************************

## CERTIFICATE OF SERVICE
## When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) November 2, 2020.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) s/ Jennifer L. Katz

*********************************************************************************

## CERTIFICATE OF SERVICE
## When Not All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) ________.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)